In re Judith M.K. FARSON, Debtor.

Gary L. Rainsdon, Trustee, Plaintiff,

v.

Judith M.K. Farson and David L. Scantlin, Defendants.

Bankruptcy No. 05–41966–JDP.

Adversary No. 07–8077.

United States Bankruptcy Court, D. Idaho.

April 3, 2008.

William R. Hollifield, Hepworth & Associates, Twin Falls, ID, for Plaintiff.

Jay D. Sudweeks, May, Sudweeks & Browning, Twin Falls, ID, for Defendants.

## MEMORANDUM OF DECISION

JIM D. PAPPAS, Bankruptcy Judge.

### Procedural History

On July 23, 2007, chapter 7[1] trustee Gary L. Rainsdon ("Plaintiff") commenced this adversary proceeding against Defen-

---

1. All chapter and section references are to the Bankruptcy Code, 11 U.S.C. §§ 101–1330, and all rule references are to the Federal Rules of Bankruptcy Procedure, Rules 1001–

dants Judith Farson and David L. Scantlin. Docket No. 1.[2] Plaintiff's Amended Complaint alleges that Farson, the debtor, failed to list a Ford Mustang in her bankruptcy schedules as an asset of the estate, and that the car should be turned over to the Plaintiff to be sold for the benefit of her creditors.[3] Plaintiff also alleged that certain payments made by Farson to Scantlin in connection with her purchase of the Mustang should be avoided and recovered as preferences.

The Court conducted a trial in this action on January 18, 2008. At its conclusion, Plaintiff made an oral motion to amend the pleadings to conform to the evidence presented at the trial. *See* Rule 7015, which incorporates Fed.R.Civ.P. 15(b)(2) (providing that a party may move "at any time" to amend pleadings to conform to evidence presented at trial.) By this motion, Plaintiff sought to add two new claims: a request that the Court disallow Farson's claim of exemption in the Mustang; and a claim for a money judgment against Scantlin in the amount of $1,874.24 as reimbursement for a lien he caused to be imposed upon the car during the pendency of the bankruptcy without Court approval. Defendants did not object to the motion, and it was granted.

Following the submission of post-trial briefs, the issues were taken under advisement. The Court has considered the submissions of the parties, the testimony and evidence presented at trial, the arguments

of counsel, as well as the applicable law. This Memorandum constitutes the Court's findings of fact, conclusions of law and decision on the issues. Rule 7052.

### Findings of Fact

At some point prior to June 2003, Scantlin, who was at the time Farson's "friend," purchased a 2000 Ford Mustang. He financed the purchase through Capitol One Auto Finance. Ex. 1; A.

On June 8, 2003, Farson agreed to purchase the vehicle from Scantlin. She signed a Contract of Purchase and Finance ("Contract"), drafted by Scantlin, to evidence the terms of the purchase. Ex. 1. The Contract required Farson to make payments to Scantlin in the amount of $389.21 per month until the total purchase price financed, $14,788.74, was paid. Upon completion of all monthly payments, the Contract also required Farson to pay Scantlin three additional installments of $500 in order to repay the $1,500 he contributed as a down payment when he purchased the vehicle from the dealer. *Id.* The Contract further provided that if Farson failed to make the required payments, the vehicle would be sold and the proceeds remaining after Capitol One Auto Finance was satisfied would be returned to Farson. *Id.* The Contract granted no security interest to Scantlin, but it provided that until Farson fulfilled all her obligations under the Contract, the Mustang would remain registered in Scantlin's name. Ex. 1; Ex. 2.[4]

9036, as they existed prior to enactment of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA"), Pub.L. 108–9, 119 Stat. 23 (Apr. 20, 2005).

**2.** The Complaint was amended on August 1, 2007. Docket No. 6.

**3.** The Court takes judicial notice of its file in the chapter 7 case, 05–41966–JDP. Fed. R.Evid. 201. Pleadings in the underlying bankruptcy case are designated as "BK Dock-

et No." while the adversary proceeding pleadings are identified as "Docket No."

**4.** As the reader has likely concluded, this two-step transaction was designed as an accommodation by Scantlin to Farson. Farson needed a vehicle, but her creditworthiness was questionable. Scantlin was a willing friend of Farson, and these transactions allowed Farson to obtain access to a vehicle using Scantlin's good credit, while, at bottom, requiring Farson to pay for the Mustang.

As time passed, Defendants' relationship became romantic, and eventually Farson moved into Scantlin's home. However, Farson continued to make the monthly car payment to Scantlin, who in turn made the payment to Capitol One Auto Finance. On May 12, 2005, Defendants were married.[5] At trial, Defendants confirmed that Farson's monthly payments to Scantlin were ongoing.

On August 30, 2005, Farson filed a chapter 7 petition.[6] Plaintiff was appointed to serve as trustee. Ex. 3; BK Docket No. 1. Farson did not list the Mustang as her asset on Schedule B, nor did she claim the vehicle exempt on Schedule C. Ex. 3. Curiously, though, Farson did list Scantlin as a secured creditor on Schedule D, and she valued his claim at $13,000, indicating that the value of the collateral for his claim was $9,000, thereby yielding an unsecured claim of $4,000. *Id.* On Schedule I Farson listed her marital status as "Single" and she listed no spouse. *Id.* Further, in answer to question 14 on the Statement of Financial Affairs concerning property held for another person, Farson noted that Scantlin was the owner of the Mustang, that it was valued at $9,000 and that it was located in "[Farson's] control & possession". *Id.* On question 15, she noted that she had lived at a different address prior to filing the petition until October, 2004, presumably at which time she moved in with Scantlin, because it is his address she listed as her own on the petition. *Id.* In the response to question 16, Farson marked the box indicating "none" when asked about spouses and former spouses. *Id.* Finally, in the form entitled "Chapter 7 Individual Debtor's Statement of Intention," Farson notes the auto loan, Scantlin as the creditor, and that she "will retain collateral and continue to make regular payments." *Id.*

At the § 341(a) meeting of creditors held on September 22, 2005, Farson testified that Scantlin was "a friend;" of course, as noted above, they were a married couple by that date.

After Farson filed her bankruptcy petition, on February 1, 2007, Scantlin borrowed money from Farmers National Bank ("Farmer's Bank Loan") offering the Mustang as security for the loan. The lender paid off Capitol One Auto Finance, and advanced additional sums to Scantlin.[7] Ex. 7. Plaintiff did not consent to this

---

**5.** There is confusion regarding the marriage date. The Defendants' wedding occurred in Honduras on May 12, 2005. However, they did not receive documentation of their marriage that would be legally recognized in the United States until sometime between Thanksgiving and Christmas, 2005. Furthermore, the certificate they eventually received reflected a marriage date of April 29, 2005, which Farson opines was the date their paperwork was received by the Honduran government. Farson was unable to change her legal name, driver's license, or Social Security card until she received the official documents.

**6.** The petition is dated August 29, 2005, but appears to have been filed with the Court on August 30, 2005. BK Docket No. 1; 4. Farson testified that she believed her petition had been filed prior to her May, 2005 marriage, and that she had signed only one petition and set of schedules, and concluded that her original attorney must have held onto her schedules and filed them much later. However, Farson's testimony is, at best, mistaken, since the "wet signature petition" retained by the clerk of this Court shows that she signed her petition and schedules on August 29, 2005. Court's Ex. 100.

**7.** The Farmers Bank Loan documents indicate a principal loan amount of $7,000, of which $2,227.79 was paid to Capitol One Auto Finance. Ex. 7. The remainder went to pay off credit cards, make minor repairs to the vehicle, and pay fees associated with the loan. The vehicle was the sole collateral on the Farmers Bank Loan. *Id.* As of the trial date, Scantlin owed approximately $1,874.24 on the Farmers Bank Loan. Ex. D.

transaction, nor was it authorized by this Court.

On March 15, 2007, Plaintiff conducted Rule 2004 examinations of both Defendants. BK Docket No. 21; 24. During her exam, Farson acknowledged that she and Scantlin had been married in May, 2005.

On July 23, 2007, Plaintiff commenced this adversary proceeding. Docket No. 1. A month later, on August 22, 2007, Farson amended her schedules to list the Mustang as her asset, and to claim it exempt. Ex. 4; 5.

### Analysis and Disposition

#### I. The Preference Claim

*A. Elements of Preference*

Plaintiff claims the payments made by Farson to Scantlin during the one year prior to the filing of the petition are avoidable as preferences under § 547(b).[8]

In order to avoid a transfer as a preference under the Code, the trustee must prove by a preponderance of the evidence that a transfer of property of the debtor occurred and that such transfer (1) was made to or for the benefit of the creditor; (2) for or on account of an antecedent debt; (3) while the debtor was insolvent; (4) within 90 days before the date of filing of the petition; and (5) enabled the creditor to receive more than it would have received in a chapter 7 liquidation if the transfer had not been made.

---

**8.** Section 547(b) provides that "the trustee may avoid any transfer of an interest of the debtor in property—

(1) to or for the benefit of a creditor;

(2) for or on account of an antecedent debt owed by the debtor before such transfer was made;

(3) made while the debtor was insolvent;

(4) made—

(A) on or within 90 days before the date of the filing of the petition; or

*Crawforth v. H & H Enterprises (In re Larison)*, 05.3 I.B.C.R. 74, 76 (Bankr.D.Idaho 2005) (quoting *Elsaesser v. Cent. Pre–Mix Concrete Co. (In re Pioneer Constr., Inc.)*, 01.2 I.B.C.R. 66, 67 (Bankr.D.Idaho 2001)) (additional citations omitted).

Under § 547(g), Plaintiff as trustee "has the burden of proving the avoidability of a [preferential] transfer...." Because Defendants have not conceded that any of the elements of § 547(b) have been met, the Court must decide whether Plaintiff has satisfied his burden of proof as to each element.

*1. Transfer of Debtor's Property to Creditor*

Prior to filing her petition, Farson made monthly payments to Scantlin under the terms of the Contract. It is unclear in what form Farson made those payments to Scantlin. The Code does not define what constitutes property of the debtor, however, the Ninth Circuit has defined the term broadly. It has stated:

Generally, property belongs to the debtor for purposes of § 547 if its transfer will deprive the bankruptcy estate of something which could otherwise be used to satisfy the claims of creditors.

*Danning v. Bozek (In re Bullion Reserve of North Am.)*, 836 F.2d 1214, 1217 (9th Cir.), cert. den., 486 U.S. 1056, 108 S.Ct. 2824, 100 L.Ed.2d 925 (1988). Thus,

---

(B) between ninety days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider; and

(5) that enables such creditor to receive more than such creditor would receive if—

(A) the case were a case under chapter 7 of this title;

(B) the transfer had not been made; and

(C) such creditor received payment of such debt to the extent provided by the provisions of this title.

whether Farson paid Scantlin in cash or by check, the transfer of those funds deprived the estate of monies which could have been used to pay creditors' claims. Accordingly, Plaintiff has demonstrated that there were transfers of Farson's property—her money—to Scantlin.

### 2. Antecedent Debt

■ Section 547(b)(2) allows recovery of transfers made "on account of an antecedent debt owed by the debtor before such transfer was made...." In other words, "[i]f the debt was created before the transfer occurred, the debt is antecedent." *Lake City R.V.,* 99.2 I.B.C.R. at 53 (citing *Fitzgerald v. Blackman (In re Blackman),* 92 I.B.C.R. 209,211 (Bankr.D.Idaho 1992)).

The Contract requiring payments from Farson to Scantlin was executed on June 8, 2003. The evidence therefore shows that any payments made by Farson to Scantlin thereafter were on account of an antecedent debt.

### 3. Insolvency

■ Under § 547(b)(3), Plaintiff must show that, at the time she made the payment to Scantlin, Farson was insolvent.[9] However, Plaintiff is aided in satisfying his burden, at least in part, by § 547(f), which provides that Farson "is presumed to have been insolvent on and during the 90 days immediately preceding the date of the filing of the petition." While this presumption effectively shifts the initial burden of proof, if Scantlin provided substantial evidence that Farson was solvent when payments were made, then the presumption vanishes, and Plaintiff would again bear the burden of proving Farson's insolvency. *Sierra Steel, Inc. v. Totten Tubes, Inc. (In re Sierra Steel, Inc.),* 96 B.R. 275, 277 (9th Cir. BAP 1989).

■ Here, Defendants presented no evidence to show that Farson was solvent during the ninety-day prebankruptcy period. Therefore, to prevail on this issue, Plaintiff was not required to present any evidence to show Farson was insolvent during this time.

### 4. Timing of Transfers and Scantlin's "Insider" Status

For Plaintiff to recover, § 547(b)(4) requires that he prove that the target transfers from Farson to Scantlin occurred either: (a) within the ninety days preceding the filing of her bankruptcy petition; or (b) that Scantlin was an insider, and the payments were made within one year preceding the bankruptcy filing.

Defendants' testimony confirmed that Farson's monthly payments to Scantlin were ongoing from and after the date they executed the Contract through trial. There is no evidence to suggest Farson ever missed a monthly payment. The Court may, and does hereby, infer that Farson made at least two payments to Scantlin during the period of June 1 to August 30, 2005, which constitutes the ninety days prior to the filing of the bankruptcy petition. Whether or not Plaintiff can recover payments made outside the ninety-day period, during the one year prior to the filing date, depends upon whether Scantlin was an "insider" under the Code.

■ As relevant to the issues here, § 101(31)(A)(i) defines "insider" to include a "relative of the debtor...." A "relative," in turn, is an "individual related by affinity or consanguinity within the third degree as determined by the common law, or individual in a step or adoptive relationship within such third degree." 11 U.S.C.

9. In section 101(32)(A), Congress defines "insolvent" with regard to individuals as a "financial condition such that the sum of such entity's debts is greater than all of such enti-

ty's property, at a fair valuation" minus property that has been concealed or transferred with intent to defraud, as well as property that is exempt under § 522.

§ 101(45). A debtor's spouse is a relative because this definition includes individuals "related [to the debtor] by affinity". *Miller v. Schuman (In re Schuman)*, 81 B.R. 583, 585 (9th Cir. BAP 1987). Thus, Scantlin was an insider as to Farson from and after at least May 12, 2005.[10]

■■ Prior to his marriage to Farson, Scantlin would not qualify as an insider under any of the other particular provisions of the Code's definition. However, "[t]he use of the word 'includes' [in § 101(31) ] is indicative of Congress' intent not to limit the classification of insiders to the statutory definition." *Miller Ave. Prof.and Promotional Servs, Inc. v. Brady (In re Enter. Acquisition Partners, Inc.)*, 319 B.R. 626, 631 (9th Cir. BAP 2004) (quoting *Friedman v. Sheila Plotsky Brokers, Inc. (In re Friedman)*, 126 B.R. 63, 69–70 (9th Cir. BAP 1991));11 U.S.C. § 102(3) (providing that " 'includes' and 'including' are not limiting"). Thus, there are effectively two types of insiders under the Code: those persons specifically described by category in § 101(31), the so-called *per se* insiders (*e.g.*, "relative," "partnership," "general partner," and "corporation"); and those persons not specifically listed in the statutory definition, but who have an otherwise "sufficiently close relationship with the debtor that his conduct is made subject to closer scrutiny than those dealing at arm's length with the debtor." *Miller*, 319 B.R. at 631 (quoting *Wilson v. Huffman (In re Missionary Baptist Found. of Am.)*, 712 F.2d 206, 210 (5th Cir.1983)) (quoting S.Rep. No. 95–989, 95th Cong., 2d Sess., *reprinted in* [1978] U.S.Code Cong. & Admin. News, pp. 5787, 5810).

■■ The courts have struggled with what constitutes a "sufficiently close rela-tionship" requiring such "closer scrutiny." The determination is a fact-intensive one, and must be decided on a case-by-case basis. *Matson v. Strickland (In re Strickland)*, 230 B.R. 276, 285 (Bankr.E.D.Va. 1999); *Three Flint Hill Ltd. P'ship v. Prudential Ins. Co. (In re Three Flint Hill Ltd. P'ship)*, 213 B.R. 292 298 (D.Md. 1997). This Court has held that a "transferee 'is an insider if, as a matter of fact, he exercises such control or influence over the debtor as to render their transaction not arms-length.' " *Elsaesser v. Cougar Crest Lodge, L.L.C. (In re Weddle)*, 353 B.R. 892, 901 (Bankr.D.Idaho 2006) (citing *Enter. Acquisition Partners*, 319 B.R. at 633 n. 5) (quoting *In re Schuman*, 81 B.R. at 586); see also *Practical Inv. Corp. v. Rellen (In re Practical Inv. Corp.)*, 95 B.R. 935, 941 (Bankr.E.D.Va.1989) (insider must have considerable control or high likelihood of control over debtor, not just mere financial power (like a lending agency) over debtor). Under § 547(b), insider status must be evaluated in relation to the debtor and at the time of the transfer. *Weddle*, 353 B.R. at 900.

Some of the decisions and factual scenarios where courts have found that a person was not an insider include: *Schuman*, 81 B.R. 583 (9th Cir. BAP 1987) (Debtor's ex-wife did not exert sufficient influence over him to render her an insider where debtor had remarried at the time of the transfer, his relationship with ex-wife was hostile, and negotiations between debtor and ex-wife were adversarial in nature); *Pfeiffer v. Thomas (In re Reinbold)*, 182 B.R. 244 (D.S.D.1995) ("friendship" alone is insufficient to confer insider status; creditor needs to dominate the debtor in order to rise to the insider level); *Barnhill v. Vaudreuil (In re Busconi)*, 177 B.R.

---

**10.** The Court elects to use May 12, 2005 as the Defendants' marriage date, since it appears from their testimony at trial that they considered themselves to have been married on that date despite the documentation challenges they encountered upon their return from Honduras to Idaho.

153 (Bankr.D.Mass.1995) (debtor's spouse held not to be an insider regarding transfers made pursuant to a antenuptial agreement during the course of acrimonious divorce proceedings even though transfers were made before divorce was final); *Thrush v. Marvin (In re Hollar)*, 100 B.R. 892 (Bankr.N.D.Ohio 1989) (mere fact that debtor and transferee were engaged to be married was not enough to confer insider status in the absence of other evidence); *Jackson Purchase Prod. Credit Ass'n v. Taylor (In re Taylor)*, 29 B.R. 5 (Bankr. W.D.Ky.1983) (buyer who had previous business transactions with debtor including construction of home and a loan, and debtor's classmate and friend, did not have sufficiently close relationship with debtor to constitute insider); *Bahas v. Sagen (In re Durkay)*, 9 B.R. 58 (Bankr.N.D.Ohio 1981) (attorney for debtor who represented debtor and debtor's corporation in complex litigation was not insider of debtor).

On the other hand, cases in which the court found an individual to be an insider include: *Browning Interests v. Allison (In re Holloway)*, 955 F.2d 1008 (5th Cir.1992) (former wife of debtor who loaned him money after divorce deemed insider in view of their continuing friendly relationship and joint hostility toward other party in litigation); *Freund v. Heath (In re McIver)*, 177 B.R. 366 (Bankr.N.D.Fla. 1995) (debtor and insider had a personal and financial relationship and lived together for over two years; insider financed the debtor's investments, debtor appointed insider to be a director of his corporation, insider allowed debtor to use her credit cards, and debtor executed holographic will to insure that the insider would be repaid); *Wiswall v. Tanner (In re Tanner)*, 145 B.R. 672 (Bankr.W.D.Wash.1992) (debtor and insider lived together in an intimate homosexual relationship which was marked by a ceremony where one partner was dominant and exerted control over debtor); *Rush v. Riddle (In re Stan-*

*dard Stores, Inc.)*, 124 B.R. 318 (Bankr. C.D.Cal.1991) (former brother-in-law of debtor's principal deemed insider even after divorce because of continued friendship as evidenced by loan and status as longtime general manager of debtor); *Grant v. Podes (In re O'Connell)*, 119 B.R. 311 (Bankr.M.D.Fla.1990) (debtor and insiders were personal friends and over $400,000 of loans were exchanged between the parties over a four year period on an informal basis with no documentation); *Castellani v. Kohne (In re Kucharek)*, 79 B.R. 393 (Bankr.E.D.Wis.1987) (debtor and insider were close friends for many years and many loans were made between them without any signed promissory notes); *Loftis v. Minar (In re Montanino)*, 15 B.R. 307 (Bankr.D.N.J.1981) (debtor lived with the insiders' daughter and indicated they were his relatives in a deed conveying real property to them).

Based upon the evidence in this case, Farson and Scantlin were apparently "friends" at the time they entered into the Mustang transaction, then at some later time became romantically involved, lived together, and eventually married. Beyond this, the Court is unable to understand the time line of Defendants' blossoming relationship, nor the degree and extent, if any, that Scantlin might have exercised influence over Farson. For example, the record does not reflect when the Defendants became engaged, although it is clear that at least by April 29, 2005, they had made plans to marry in Honduras, and had filed the necessary paperwork with the Honduran government to do so. However, Farson's status as Scantlin's "girlfriend and future fiancee" is not, alone, enough to establish insider status. *Hollar, supra.*

It appears from Farson's Statement of Financial Affairs that Defendants lived together in Scantlin's home beginning in October, 2004. However, there is little evi-

dence in the record about their financial dealings prior to their marriage, *e.g.*, whether they commingled their finances, whether they spoke about money matters, and such. Farson apparently made payments to Scantlin from and after June, 2003, first as creditor, then as boyfriend, roommate, and finally as her husband, pursuant to the terms of the Contract. Strictly speaking, there is no evidence that Scantlin ever exercised the sort of influence and control over Farson's decision-making so as to render her contractual obligation to make payments to him less than "arm's-length." Based upon this record, the Court is unwilling to infer that Defendants' relationship was such that it should be regarded with the sort of "greater scrutiny" required for insider status at any time prior to May 12, 2005, when Scantlin became a *per se* insider.

In summary, Plaintiff has not proven that, for purposes of § 547(b)(4)(B), any payments made by Farson to Scantlin occurring prior to their marriage were made to an "insider." Under § 547(b)(3), Plaintiff may therefore assail only those payments made by Farson to Scantlin between May 12, 2005, and the bankruptcy petition date, August 30, 2005. During the ninety days prior to the bankruptcy date (*i.e.*, June 1, 2005) Farson was presumed to be insolvent, a presumption that has not been rebutted by Scantlin. However, if Farson made payments to Scantlin during the 19–day window between May 12 and June 1, to avoid them, Plaintiff must prove that Farson was insolvent at the time without benefit of the statutory presumption.

Plaintiff's proof concerning the amount and timing of payments is vague and deficient. The Contract requires monthly payments, but does not obligate Farson to make those payments on or before any particular date during any given month. And Plaintiff did not present any specific evidence concerning when Farson made individual payments. Instead, the testimony showed only that Farson had been continually paying Scantlin under the terms of the Contract, and was still paying him even up to the date of trial.

From this evidence, the Court has no way to determine when the payment due in May, 2005 was made. As a result, the Court cannot find that any payment was made by Farson to Scantlin as an insider during the extended reach-back period from May 12 to June 1, 2005. Indeed, based upon the evidence, while the Court can, and does, find that the May, 2005 contract payment was made, it is certainly as plausible that Farson made that transfer prior to, as opposed to on or after, May 12, 2005. Because the Plaintiff has not proven a payment was made to Scantlin as an insider between May 12 and June 1, 2005, it is unnecessary for the Court to decide whether Farson was insolvent at the time.[11]

By the same token, Plaintiff failed to submit evidence that would allow the Court to find when the August, 2005 monthly payment was made by Farson to Scantlin. As a result, it would be mere speculation for the Court to assume that the payment was not made after August 30—on August 31 or some date thereaf-

---

11. For what it's worth, the proof presented at trial regarding Farson's insolvency was ambiguous. Farson testified that she initially sought counsel regarding the possibility of filing for bankruptcy in December, 2004, and Scantlin testified that he knew, prior to their marriage, that Farson likely intended to file for bankruptcy, and that she had already con- sulted with a bankruptcy attorney. Beyond that testimony, the Court has only Farson's schedules upon which it could decide the issue of insolvency. While Farson's schedules indicate at filing she had virtually no assets, and approximately $61,000 in liabilities, it is difficult to determine her financial status as any given point in time prior to bankruptcy.

ter—thereby insulating it from avoidance as a preference.[12]

All things considered, because both Defendants testified that Farson's monthly car payments were current when she filed her bankruptcy petition, the Court finds that Farson made two monthly payments to Scantlin in the amount of $389.21 each during the ninety days prior to bankruptcy that are potentially avoidable by Plaintiff as a preference.

### 5. *Inequitable Receipt*

■ The final element in the preference analysis, found in § 547(b)(5), requires Plaintiff to prove that, if the target transfers were allowed to stand, Scantlin would receive more than he would otherwise have received as an unsecured creditor in a hypothetical liquidation of Farson's assets under chapter 7. Plaintiff has successfully shown this to be true here.

Even a cursory review of Farson's schedules reveals that she had considerably more unsecured debt than assets. And, while Farson listed Scantlin as a secured creditor on Schedule D, his counsel concedes, and the Court agrees, that the Contract securing Farson's obligation to pay for the vehicle is insufficient to bestow secured status on him. Therefore, Scantlin is a general unsecured creditor.

There are three creditors listed in Farson's schedules that hold unsecured priority claims totaling $10,191.99. Given that Farson's amended schedules list a total of $6,635 in assets, it is unlikely there would have been full distribution to the priority

unsecured creditors, let alone the general unsecured creditors. As a result, the Court can confidently conclude that any payments Scantlin received during the preference period allowed him to fare much better than he would have as a general unsecured creditor in a chapter 7 bankruptcy case.

In summary, the Court concludes that all elements of § 547(b) have been met as to the June and July, 2005, payments.

### B. *Contemporaneous Exchange Defense*

Having determined that two monthly payments made by Farson to Scantlin are preferences, the burden shifts to Scantlin to show that one or more of the exceptions to avoidance under § 547(c) insulates these payments from avoidance. 11 U.S.C. § 547(g) (providing that the defendant in a preference action bears "the burden of proving the nonavoidability of a transfer under subsection (c) of [§ 547]...."); *Larison*, 05.3 I.B.C.R. at 76 (citing *Pioneer Constr.*, 01.2 I.B.C.R. at 67).

Scantlin contends, without any further explanation, that "[t]here is not a preference in this case because there was a contemporaneous exchange and it was for new value." Docket No. 17. Presumably, Scantlin intended to invoke the contemporaneous exchange defense found in § 547(c)(1).[13] That exception protects a transfer:

(1) to the extent that such a transfer was—

---

**12.** If payments were made by Farson to Scantlin after the petition was filed using property of the bankruptcy estate, they may be avoidable under § 549(a) as unauthorized post-petition transfers. However, Plaintiff did not allege nor prove any such claim.

**13.** It appears Defendants' counsel may be mistaken in his understanding of the burden of proof. In post-trial briefing, he states, "In

any event, one need not get to the insolvency issue because it was a contemporaneous exchange and it was for new value." Docket No. 17, p. 3. Of course, it was Plaintiff's burden to prove the elements of § 547(b). Then, and only then, would the Court entertain any suggestion that the payments made constitute a contemporaneous exchange for new value, something Scantlin must prove. *See Larison, supra.*

(A) intended by the debtor and the creditor ... to be a contemporaneous exchange for new value given to the debtor; and

(B) in fact a substantially contemporaneous exchange[.]

11 U.S.C. § 547(c)(1).

"The rationale for the exception is that, because new value is given, a contemporaneous exchange does not diminish the debtor's estate." *Endo Steel, Inc. v. Janas (In re JWJ Contracting Co., Inc.)*, 371 F.3d 1079,1081–82 (9th Cir.2004) (citing *Milchem Inc. v. Fredman (In re Nucorp Energy)*, 902 F.2d 729, 733 (9th Cir.1990)).

In order for Defendants to take advantage of this defense, there must have been, in fact, new value advanced by Scantlin to Farson in exchange for each of her payments. In this way, Farson's bankruptcy estate would not have been diminished as a result of the payments made.

For this purpose, "new value" is defined as:

> money or money's worth in goods, services, or new credit, or release by a transferee of property previously transferred to such transferee in a transaction that is neither void nor voidable by the debtor or the trustee under any applicable law, including proceeds of such property, but does not include an obligation substituted for an existing obligation.

11 U.S.C. § 547(a)(2). To perform a contemporaneous exchange analysis, the Court must be able to measure the value given to Scantlin, as well as the new value given by him to Farson, as the transfer is only excepted from avoidance *to the extent* the transfer was given for that new value. *Sulmeyer v. Pacific Suzuki (In re Grand Chevrolet, Inc.)*, 25 F.3d 728, 733 (9th Cir. 1994); *In re Nucorp Energy*, 902 F.2d at 733; 11 U.S.C. § 547(c)(1).

The Contract required Farson to make monthly payments to Scantlin of $389.21 each, and there is no evidence to show that she ever paid him any amount less than what was contractually due. The basis of Scantlin's contemporaneous exchange argument is not explained in his brief, but presumably, he contends that when he, in turn, made the payments due to Capitol One on the Mustang, he extended "new value" and Farson was benefitted. However, it is undisputed that Farson was purchasing the Mustang from Scantlin, and that she was not obligated on Scantlin's Capital One loan. It is therefore difficult to see how Scantlin's payments to Capital One amounted to new value given to Farson, or how she benefitted from such payments. Simply making installment payments on a loan does not meet the requirements for insulation against a trustee's preference attack. *See Sanyo Elec., Inc. v. Taxel (In re World Fin. Services Ctr., Inc.)*, 78 B.R. 239, 241 (9th Cir. BAP 1987), *aff'd*, 860 F.2d 1090 (9th Cir.1988) (unpublished disposition); *McClendon v. Cal–Wood Door (In re Wadsworth Bldg. Components, Inc.)*, 711 F.2d 122, 124 (9th Cir.1983).

Moreover, as noted above, the record is unclear when during the preference period Farson made monthly payments to Scantlin. While the evidence shows that Scantlin made payments to Capital One during both June and July, 2005, there is no evidence to show that these payments came after (*i.e.*, in exchange for) any payments made by Farson to Scantlin. Ex. B. Simply put, Scantlin offered no competent evidence that he extended any new value to Farson in exchange for any of the payments she made to him during the preference period.

Accordingly, under § 547(b) and § 550(a), Plaintiff may recover the two

monthly payments from Scantlin as preferences.

## II.

### The Exemption Claim

A chapter 7 trustee is entitled to possession of estate property, and the debtor has a duty to surrender it to him. 11 U.S.C. §§ 521(a)(4), 542(a); *In re Adams*, 92 I.B.C.R. 47, 47 (Bankr.D.Idaho 1992). Plaintiff alleged that the Mustang was property of the estate, and sought an order requiring Defendants to turn it over to him for liquidation. While Defendants initially resisted,[14] they eventually conceded that the Mustang was indeed property of the estate, and that Plaintiff is entitled to possession.

In her original schedules filed along with her petition, Farson neither listed the vehicle as an asset, nor claimed it as exempt. BK Docket No. 1. On August 22, 2007, approximately one month after Plaintiff commenced this adversary proceeding, Farson amended her schedules to list the vehicle as an asset on Schedule B, and to claim it exempt on Schedule C under Idaho Code § 11–605(3) in the amount of $3,000. BK Docket No. 28; 29.

While Plaintiff's Amended Complaint in this adversary proceeding included a claim for turnover of the Mustang, Plaintiff never formally objected to Farson's claim of exemption asserted in her amended Schedule C. Indeed, Plaintiff asserted no challenge to Farson's exemption claim until he sought to amend his complaint in this action to conform to the evidence at the conclusion of the trial.

Rule 4003 provides, in pertinent part:

A party in interest may file an objection to the list of property claimed as exempt within 30 days after the meeting of creditors held under § 341(a) is concluded or within 30 days after any amendment to the list or supplemental schedules is filed, whichever is later. The court may, for cause, extend the time for filing objections if, before the time to object expires, a party in interest files a request for an extension.

From the Court's docket, it is clear that Plaintiff failed to either object to the claimed exemption in the amended schedules, or seek an extension of time in which to do so. Under the Code, if the Rule 4003 objection period expires without a proper objection being made, the debtor's property "is exempt." 11 U.S.C. § 522(*l*). In the bankruptcy vernacular, this is referred to as "exemption by default" or "exemption by declaration." *Heintz v. Carey (In re Heintz)*, 198 B.R. 581, 583–84 (9th Cir. BAP 1996).

The United States Supreme Court has imposed a bright line rule concerning the necessity of objecting to a claim of exemption in a timely manner. In *Taylor v. Freeland & Kronz*, 503 U.S. 638, 643–44, 112 S.Ct. 1644, 118 L.Ed.2d 280 (1992), the court rejected a trustee's untimely objection to a claimed exemption, holding simply that he "cannot contest the exemption at this time whether or not [the debtor] had a colorable statutory basis for claiming it." *Id.*; see also *Crawforth v. Bachman (In re Bachman)*, 07.4 I.B.C.R. 82 (Bankr.D.Idaho 2007). This Court therefore has no discretion to disallow an exemption in the absence of a timely objection.

14. Defendants' Answer to Plaintiff's Amended Complaint alleged that "the value of the vehicle is less than the combined total of the money owed to a secured creditor and the debtor Judy Farson Scantlin's homestead [sic] exemption." Answer, ¶ 5, BK Docket No. 8. While it may have practical implications, the value of property of estate has no impact on the trustee's statutory right to possession of such property.

■ Plaintiff essentially argues that his failure to object is of no moment because § 522(g) precludes Farson's claim of exemption on property recovered by Plaintiff under § 547 if Farson made the transfers voluntarily or concealed the property.[15] The BAP has explained the function of this statute:

> The purpose of § 522(g) is to prevent a debtor from claiming an exemption in recovered property which was transferred in a manner giving rise to the trustee's avoiding powers, where the transfer was voluntary or where the transfer or property interest was concealed. Since the Code is based upon providing honest debtors with a fresh start, a debtor who has voluntarily transferred property in an avoidable transaction or who has been dishonest in concealing assets or prepetition transfers should not be allowed to use § 522(g) as a shield.

*Hitt v. Glass (In re Glass)*, 164 B.R. 759, 764 (9th Cir. BAP 1994), aff'd, 60 F.3d 565 (9th Cir.1995) (internal citation omitted).

The obvious difficulty with Plaintiff's position is that § 522(g) requires that the property claimed exempt be *transferred* and then *recovered*.[16] The Code defines "transfer", in pertinent part as "every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with property or with an interest in property ...;" 11 U.S.C. § 101(54). Here, it is undisputed that there was no "disposing of" or "parting with" the Mustang, and hence no transfer.[17] It remained in Farson's possession the entire time; only Farson's payments were transferred to Scantlin. Although Plaintiff had to seek the Court's determination that the vehicle was property of the estate, and that it should be turned over to him, he was merely seeking to extract it from Farson's grasp, not to "recover" the car from a third party to whom Farson had transferred it. Accordingly, § 522(g) constitutes no impediment to Farson's claim of exemption in the Mustang.

## III.

### The Lien Reimbursement Claim

■ Lastly, Plaintiff seeks a money judgment against Scantlin for $1,874.24 as reimbursement to the bankruptcy estate for the lien he caused to be placed on the Mustang after the bankruptcy filing and without Plaintiff's consent or the Court's permission. As a statutory basis for this request, Plaintiff inexplicably cites § 364(c)(2), which provides:

> (c) If the trustee is unable to obtain unsecured credit allowable under section 503(b)(1) of this title as an administrative expense, the court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt—

> (B) the debtor did not conceal such property; ...

---

15. Section 522(g) provides:
 Notwithstanding sections 550 and 551 of this title, the debtor may exempt under subsection (b) of this section property that the trustee recovers under section 510(c)(2), 542, 543, 550, 551, or 553 of this title, to the extent that the debtor could have exempted such property under subsection (b) of this section if such property had not been transferred, if—
 (1)(A) such transfer was not a voluntary transfer of such property by the debtor; and

16. The courts have adopted a broad reading of the term "recovered" under § 522(g). *Hitt v. Glass (In re Glass)*, 60 F.3d 565, 569 (9th Cir.1995).

17. The Court notes that the vehicle was not recovered under § 547, but rather § 542, which also implicates § 522(g).

(2) secured by a lien on property of the estate that is not otherwise subject to a lien;

11 U.S.C. § 364(c)(2).

The Court is at a loss to explain how this statute is implicated in this action, or how it allows Plaintiff to recover a money judgment against Scantlin under these facts. The cited Code provision, by its terms, applies only to requests made by a trustee to incur secured credit during a bankruptcy case, something of critical import in many reorganization cases where, under § 1107, a debtor-in-possession stands in the trustee's shoes for this purpose. *See Sherman v. Harbin (In re Harbin)*, 486 F.3d 510, 521 n. 10 (9th Cir.2007) (although section 364(c) refers to a trustee obtaining credit, it applies with equal force to debtors in possession prior to the appointment of a trustee); *Thompson v. Margen (In re McConville)*, 110 F.3d 47,50 (9th Cir.1997).

Section 364(c)(2) has no application in this context, and Plaintiff's claim against Scantlin lacks any merit.[18]

### Conclusion

Plaintiff has proven that Defendant Scantlin received avoidable preferences during the ninety days prior to Farson's bankruptcy filing. Plaintiff is entitled to recover $778.42 (*i.e.*, $389.21 × 2) from Scantlin. Farson is entitled to the exemption she claimed in the Mustang under Idaho Code § 11–605(3) because Plaintiff did not timely object to that exemption claim. Plaintiff may not rely on § 522(g) as a defense to the exemption claim.

Finally, Plaintiff's claim against Scantlin for reimbursement of funds he received as a result of the post-petition Farmer's Bank loan under § 364(c)(2) is untenable; that Code provision is simply inapplicable in this context.

A separate judgment will be entered.

---

**18.** Plaintiff's right to relief, if any, would likely be premised upon § 549(a) which allows a trustee to avoid certain unauthorized post-bankruptcy transfers of the property of the estate. Arguably, as the beneficiary of the post-petition loan from Farmer's Bank, Scantlin could be the target of such a claim under § 550(a). Plaintiff might also have sued Farmer's Bank to contest the validity of the lien under these circumstances. Since Plaintiff has not asserted such claims, and since Farmer's Bank is not a party to this action, the Court is powerless to grant Plaintiff any relief.